# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AMPCO SYSTEM PARKING, | ) | CASE NO. 1:11CV1172 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| IMPERIAL PARKING CANADA | ) | **MEMORANDUM OPINION** |
| CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court is defendant's motion, brought pursuant to Fed. R. Civ. P. 12(b)(2), to dismiss for lack of personal jurisdiction (Doc. No. 3), plaintiff's memorandum in opposition (Doc. No. 6), defendant's reply (Doc. No. 8), and plaintiff's sur-reply (Doc. No. 13). The Court has also considered information submitted by defendant in a brief filed in opposition to plaintiff's motion for leave to file surreply. (Doc. No. 11; *see also* Doc. No. 12.) For the reasons discussed herein, the motion is **GRANTED**.

## I. BACKGROUND

On or about May 6, 2011, plaintiff Ampco System Parking ("Ampco"), a California corporation with offices in Cuyahoga County (Compl. ¶ 1), filed suit in the Cuyahoga County Court of Common Pleas against defendant Imperial Parking Canada Corporation ("Impark"), a Canadian corporation that allegedly conducts business in Cuyahoga County (Comp. ¶ 2). On June 7, 2011, Impark removed the action to federal court on the basis of diversity jurisdiction. (Doc. No. 1.) The complaint asserts the following claims: (1) breach of

contract; (2) breach of implied duty of good faith; (3) promissory estoppel; and (4) unjust enrichment; it seeks an accounting, damages, and declaratory and injunctive relief. All of the claims are based on the following underlying facts gleaned from the complaint.

Ampco has over 50 years of experience managing and operating parking facilities across the United States, including parking facilities for airports, colleges, hotels, offices, retail establishments, hospitals, and shopping malls. (Compl. ¶ 4.) As of February 2008, plaintiff operated facilities at 28 airports across the United States. (Compl. ¶ 6.)

In February 2008, the Greater Toronto Airports Authority ("GTAA") accepted proposals to operate parking facilities and lots at the Toronto Pearson International Airport ("Toronto-Pearson"), the largest and busiest airport in Canada. (Compl. ¶ 5.) Because "Impark did not possess experience sufficient to secure a contract with the GTAA[]" (Compl. ¶ 6), it "enlisted [p]laintiff for purposes of 'representing the strongest possible operating entity for the parking operations' at Toronto-Pearson." (Compl. ¶ 7.) Ampco and Impark agreed to a 50/50 split of any profits or losses associated with parking services provided at Toronto-Pearson. (Compl. ¶ 8.)

Impark submitted a timely proposal to GTAA to run the parking facilities. (Compl. ¶ 8.) At the time, Impark did not run parking facilities at airports similar in scope to those that would be required at Toronto-Pearson. (Compl. ¶ 10.) Impark's proposal was accepted by GTAA and parking services for Toronto-Pearson were provided beginning in mid-2008. (Compl. ¶ 12.)

In early 2009, before disclosing to Ampco what the net profit was for parking services provided at Toronto-Pearson, Impark offered to buy out Ampco's interest for approximately $85,000. (Compl. ¶ 13.) Impark already knew that each 50% share would be

2

significantly more than $85,000. (Comp. ¶ 14.) Ampco declined the buyout offer, preferring first to learn what the net profit would be. Ampco's share of the net profit for just a portion of the 2008 fiscal year turned out to be $144,312.08, which Impark paid. (Compl. ¶¶ 15, 16.)

In late 2009, Impark once again offered to buy out Ampco's interest, this time for about $200,000. Once again, Ampco declined, preferring to wait until its net share of the profits could be determined. Ampco's share turned out to be $391,718.22, which Impark paid. (Compl. ¶¶ 17-19.)

When it came time for Impark to pay Ampco its share for 2010, it refused to pay the properly computed amount. (Compl. ¶ 21.) Instead, when calculating Ampco's share of the profits, Impark violated the parties' agreement by assessing at least $8,500 per month to recover undefined "off-site costs[,]" plus over $700,000 in other "unidentified and unverified expenses." In addition, Impark threatened to squeeze Ampco out of its interest in the Toronto-Pearson parking services in the future, even if the same services agreement was renewed by GTAA without rebidding. (Compl. ¶¶ 22-23.) Ampco demanded its full 50% share of the 2010 fiscal year profits, but Impark refused to pay. Ampco also requested an accounting and further detail regarding the expenses and undefined costs, but Impark stated that it would not provide such detail, due to unspecified "competitive reasons." (Compl. ¶ 24.) This lawsuit followed.

## II. DISCUSSION

### A.    Legal Standard

When a defendant challenges personal jurisdiction

[...] the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions. *Serras [v. First Tennessee Bank Nat. Ass'n]*, 875 F.2d [1212], 1214 [(6th Cir. 1989)]. The court has discretion to select which method it will follow, and will only be

> reversed for abuse of that discretion. *See Michigan Nat. Bank v. Quality Dinette, Inc.*, 888 F.2d 462, 466 (6th Cir.1989); *Serras*, 875 F.2d at 1214. However, the method selected will affect the burden of proof the plaintiff must bear to avoid dismissal. *Serras*, 875 F.2d at 1214.

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where a district court decides the issue solely on the basis of written materials and affidavits,[1] "the burden on the plaintiff is relatively slight, […] and the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal[] […]." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (internal quotation marks and citations omitted). Plaintiff can meet this burden by "'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction.'" *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. Cal. Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)); *see also Joffe v. Cable Tech, Inc.*, 163 Ohio App. 3d 479, 486 (Ohio Ct. App. 2005) ("A prima facie showing exists if a plaintiff produces sufficient evidence to allow reasonable minds to conclude that the trial court has personal jurisdiction."). When making this determination, the court "must view the pleadings and affidavits in the light most favorable to [the plaintiff] and not consider the controverting assertions of [the defendant]." *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000).

**B.      The Law of Personal Jurisdiction**

In a diversity case, to determine whether personal jurisdiction exists over a defendant, federal courts apply the law of the forum state, subject to the limits of the Due

---

[1] Obviously, consideration of these affidavits relating to facts meant to establish the existence of personal jurisdiction, or lack thereof, does not require the Court to convert these motions to dismiss to motions for summary judgment. *See Theunissen*, 935 F.2d at 1458 ("in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction").

Process Clause of the Fourteenth Amendment." *Compuserve Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

> [...] The exercise of personal jurisdiction is valid only if it meets both the state long-arm statute and constitutional due process requirements. *See Nationwide Mutual Ins. Co. v. Tryg International Ins. Co.*, 91 F.3d 790, 793 (6th Cir.1993) (citing *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir.1994)). Although the Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause, our central inquiry is whether minimum contacts are satisfied so as not to offend "traditional notions of fair play and substantial justice." *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir.1998) (citing *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 638 N.E.2d 541, 545 n. 1 (Ohio 1994) (per curiam)).

*Calphalon*, 228 F.3d at 721.

Ohio's long-arm statute[2] is "very broadly worded and permit[s] jurisdiction over nonresident defendants who are *transacting any* business in Ohio." *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St. 3d 73, 75 (1990) (emphasis in original).[3]

The minimum contacts test for establishing personal jurisdiction under the due process clause is satisfied either through general or specific jurisdiction. *Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 981 (6th Cir. 1992). General jurisdiction is established by a defendant's "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 406, 414 (1984). Specific jurisdiction, however, subjects the

---

[2] Ohio's long-arm statute provides, in relevant part: "A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's [...] [t]ransacting any business in this state[...]." Ohio Rev. Code § 2307.382(A)(1).

[3] In *Kentucky Oaks*, the Ohio Supreme Court reversed the lower court's conclusion that there was no personal jurisdiction over Mitchell's Formal Wear ("MFW"). MFW, a Georgia corporation, defaulted on a lease agreement it had with Kentucky Oaks Mall Company, an Ohio corporation. The lease concerned a storeroom located at Kentucky Oaks Mall in Paducah, Kentucky. MFW "negotiated the lease by telephone contact to Ohio with an Ohio-based limited partnership[,]" and "intentionally and voluntarily entered into a ten-year contract by signing the document in Georgia and mailing it to Ohio. 53 Ohio St. 3d at 75-76. The lease "create[d] ongoing duties and obligations for the life of the contract." *Id.* at 76. Therefore, "[t]he fact that [MFW] maintained no physical presence in Ohio [did] not preclude a finding that it transacted business in this state." *Id.* The court concluded that MFW's conduct fell "unequivocally within the plain and broad language" of the long-arm statute. *Id.*

defendant to suit in the forum state only on claims that arise out of or relate to a defendant's contacts with the forum. *Id*.

In *S. Mach. Co. v. Mohasco Indus., Inc.* 401 F.2d 374 (6th Cir. 1968), the court established a three-part test for determining whether specific jurisdiction exists, which incorporates due process concerns:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id*. at 381.

The purposeful availment requirement is the "sine qua non" for personal jurisdiction. *Id*. at 381-82. It "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third person[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). To satisfy the requirement, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denkla*, 357 U.S. 235, 253 (1958). "[P]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (quotation and citation omitted).

Once the purposeful availment requirement is satisfied, a plaintiff must show that the cause of action arises from the defendant's activities in the forum state. This "lenient standard" asks whether the cause of action was "made possible by" or "lie[s] in the wake of" the

defendant's contacts, or whether the cause of action is "related to" or "connected with" the defendant's contacts with the forum state. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007).

Finally, when considering the last prong of the due process analysis, the Court is to consider several factors, including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Court of Solano Cnty., Cal.*, 480 U.S. 102, 114 (1987). Where the first two prongs of the due process inquiry have been satisfied, the Court will "presume the specific assertion of personal jurisdiction was proper." *Cole*, 133 F.3d at 436.

C.      **The Parties' Positions**

Impark argues that it does not transact business in Ohio. It asserts that it is a Canadian corporation with its principal place of business in Vancouver, Canada. (Craig Decl. ¶ 2.)[4] (Doc. No. 3-2.) Although Impark manages and operates parking facilities, it does not do so in Ohio. (*Id.* ¶ 3.) Impark has no employees, officers, facilities, or offices in Ohio, and has never had a place of business in Ohio. (*Id.* ¶¶ 4-5.) Impark is not licensed to do business in Ohio and has no statutory agent in Ohio. (*Id.* ¶¶ 6-7.) Impark does not own or lease any buildings or land in Ohio. (*Id.* ¶ 8.) Impark has not and does not regularly solicit business in Ohio and, specifically, has never advertised in any Ohio newspapers or periodicals, or maintained any listings in Ohio telephone directories. (*Id.* ¶¶ 9-11.) None of Impark's employees have traveled to Ohio for the purpose of soliciting customers. (*Id.* ¶ 12.) Impark also has never sued in Ohio,

---

[4] Gordon Craig is, and at all relevant times was, Senior Vice President of Impark, located at 178 Queens Quay East, Toronto, Ontario, Canada. (Craig Decl. ¶ 1.)

nor has it ever paid state or local taxes in Ohio. (*Id.* ¶¶ 13-14.) Impark asserts that it has no contacts with Ohio companies. (*Id.* ¶ 15.)[5]

Impark acknowledges that, around the time it submitted its bid to manage and operate the Toronto-Pearson parking facilities, it discussed an arrangement with Ampco whereby Ampco would provide consulting assistance to Impark's efforts to procure the work from GTAA, in return for a 50/50 split of any profits. Impark argues, however, that "neither the negotiations of the GTAA Contract nor the performances pursuant to the GTAA [C]ontract have taken place in Ohio." (Doc. No. 3 at 4, citing Craig Decl. ¶¶ 17-18.) Impark argues that the performance of the GTAA Contract has taken place entirely in Canada. (Craig Decl. ¶ 18.) Of the employees of Ampco who were involved in the negotiations or otherwise worked with Impark, only two were located in Ohio; the rest were in California, Texas, and Florida. (*Id.* ¶ 19.) The Impark employees who negotiated the consulting agreement with Ampco were not located in Ohio; they were in Canada. (*Id.* ¶ 20.) Impark signed no contracts relating to the consulting agreement in Ohio, nor were any visits to facilities or any other significant meetings held in Ohio during the course of the parties' work as it related to the GTAA Contract. (*Id.* ¶ 22.) The only time an Impark employee visited Ohio was when Gordon Craig flew to Cleveland in 2009 for a lunch with Ampco personnel to discuss Ampco's non-compliance with the proposed arrangement related to the GTAA Contract. (*Id.* ¶ 23.)[6] Discussions in February and March of 2009 relating to the parties' continuing disagreement as to the terms of the consulting agreement were carried on in correspondence traded between executives at Impark in Vancouver, Canada and Richard

---

[5] Of course, Ampco, although it is a California corporation, has offices in Cuyahoga County; therefore, it is an "Ohio company" for purposes of personal jurisdiction analysis and Impark unquestionably has contacts with Ampco.

[6] Ampco's current President, Mark Muglich, characterizes this meeting somewhat differently, asserting that he met personally with Craig in Cleveland "[i]n July 2009, before Impark Canada refused to provide Ampco with its 50% share of profits from the GTAA project[.]" (Muglich Aff. ¶ 12.)

Kindorf, the then-President of Ampco,[7] in Los Angeles, California, where Ampco maintains its corporate office. (*Id.* ¶ 25; *see also* Doc. No. 3-3.) Thus, Impark maintains that it has, at best, negligible contacts with Ohio and certainly not enough contact to establish general or specific jurisdiction over Impark.

In opposition, Ampco argues that "transacting any business" is very broadly worded in Ohio's long-arm statute and "means to prosecute negotiations; to carry on business; to have dealings […]." (Opposition, Doc. No. 6 at 7-8, quoting *Ky. Oaks Mall*, 53 Ohio St.3d at 75.) Ampco rejects Impark's heavy reliance on the fact that it maintains no physical presence in Ohio. *See*, *Civil Eng'rs of Sw. v. McGlothin & Assocs.*, No. 13854, 1993 WL 459812, at *1 (Ohio Ct. App. Nov. 8, 1993) ("McGlothin's 'transaction of any business' consisted of using telephone and mail service to solicit and request an estimate for professional services from an Ohio resident, to authorize work to be performed in Michigan by an Ohio corporation, and to pay, protest, and acknowledge bills sent from Ohio to Michigan.") (citing *Ky. Oaks Mall*, *supra*, for the conclusion that a "nonresident lessee, for the purposes of personal jurisdiction, is 'transacting any business' within the plain and common meaning of the phrase, where the lessee negotiates, and through the course of dealing becomes obligated, to make payments to its lessor in Ohio.").

Here, the Complaint alleges that, "[b]ecause Impark knew it could not secure the GTAA contract to service parking needs at Toronto-Pearson on its own [due to its lack of sufficient experience], Impark enlisted [Ampco] for purposes of 'representing the strongest possible operating entity for the parking operations' at Toronto-Pearson." (Compl. ¶ 7.) This

---

[7] The affidavit filed by Ampco's current President, Mark Muglich, states that he was President "at all relevant times." Muglich is located in Cleveland, Ohio. Although, when considering a motion to dismiss without conducting a hearing, the Court must take as true the assertions in the affidavits supplied by plaintiff, in this case the record clearly shows that Kindorf, not Muglich, was President of Ampco in February 2009. *See, e.g.*, Doc. No. 3-3.

business relationship between Impark and Ampco was designed to obligate the parties for five years or more. (Muglich Aff. ¶ 13[8] [Doc. No. 6-3].) Several Ampco employees who work in Ohio attest to having sent and received various kinds of communications relating to the GTAA project (telephone calls, emails, letters, facsimiles) to and from Impark employees. (*Id*. ¶ 5; Bush Aff. ¶ 4[9] [Doc. No. 6-1]; Leaf Aff. ¶ 4[10] [Doc. No. 6-2].) Muglich also received from Impark payments and statements relating to the calculation of profits from the GTAA project. (Muglich Aff. ¶ 11.) In addition, in July 2009, Muglich personally met with Gordon Craig, in Cleveland, in connection with the GTAA project. (*Id*. ¶ 12.)[11]

Ampco also argues that services related to the GTAA proposal were provided by Ampco employees in Cleveland, Ohio and Impark's affiant, Gordon Craig, even identified these Ampco employees as "Key Team Members" and "Project Champions" for certain phases of the GTAA work. (Bush Aff.; Ex. A, GTAA Workbook at 1, 14.) Ampco argues that, more importantly, Impark identified its own Columbus, Ohio employee, Vicki Pero, to GTAA as a Project Champion and Key Team Member for two phases of the GTAA project. (*Id*. at 1, 12.) Therefore, according to Ampco, both plaintiff and defendant had employees working on the GTAA project in Ohio.

Finally, Ampco asserts that Impark's breach of contract occurred when it sent a reduced share of the profits to Ampco in Ohio (Muglich Aff.; Exs. G, H; Compl. ¶¶ 15-19) and

---

[8] Mark Muglich is currently President of Ampco, located at 1459 Hamilton Ave., Cleveland, Ohio. (Muglich Aff. ¶¶ 1-2.) He has worked on the GTAA project since 2008. (*Id*. ¶ 3.)

[9] Brian Bush is, and at all relevant times was, Vice-President of Ampco, located at 1459 Hamilton Ave., Cleveland, Ohio. (Bush Aff. ¶¶ 1-2.) He has worked on the GTAA project since 2008. (*Id*. ¶ 3.)

[10] John Leaf is, and at all relevant times was, a Senior Branch Manager of Ampco, located at 1459 Hamilton Ave., Cleveland, Ohio. (Leaf Aff. ¶¶ 1-2.) He has worked on the GTAA project since 2008. (*Id*. ¶ 3.)

[11] At the time of the July 2009 meeting, Muglich was the Executive Vice President of Ampco, not the President. *See* Doc. No. 6-3 at 9.

that, when Impark continued to refuse to pay Ampco its full share or to provide an accounting, those communications were sent to Muglich in Ohio (*Id*.; Exs. L, M).[12]

In its reply brief, Impark supplies a second declaration of Gordon Craig ("Craig Decl. II") (Doc. No. 8-1), asserting that Impark had no control over which employees from Ampco's organization were chosen to work on the GTAA project, that Impark neither suggested nor anticipated that people in Ohio would work on the project, and that Impark's focus was entirely on the work that had to be done by both parties on-site at Toronto-Pearson. (Craig Decl. II ¶ 4.) Craig further asserts that, once Ampco chose to use several employees from its Cleveland office on the GTAA project, Impark had to correspond with those employees in Cleveland in order to discuss work on the project. (*Id*. ¶ 5.) Craig also points out that all the drafts of the consulting agreement (which, admittedly, was never finalized) required that any controversy under the agreement would be settled by arbitration in Ontario under Ontario's Arbitration Act. (*Id*. ¶¶ 6-11.)

The reply brief also contains the declaration of Vicki Pero wherein she states that she is, and has been at all relevant times, employed and compensated by Impark U.S. in Philadelphia, Pennsylvania. (Pero Decl. ¶ 1-2.) (Doc. No. 8-6.) Pero telecommutes from her residence in Columbus, Ohio to Impark U.S. corporate headquarters in Philadelphia. Her email signature block reflects the address of Impark U.S. in Philadelphia. (*Id*. ¶ 3; Ex. B-1.) Pero asserts that her involvement in the GTAA project was "minimal and completed during the early planning stages[,]" ending "sometime in June of 2008[,]" as shown by the listing of team members on the June 2008 spreadsheet, where her name does not appear. (*Id*. ¶¶ 4, 5; Ex. B-2.)

---

[12] Alternatively, Ampco argues that Impark has a U.S. branch ("Impark U.S.") and that Impark (Canada) is an alter ego for Impark U.S., which is subject to the Court's jurisdiction. Because the Court is able to resolve the instant motion with a straightforward personal jurisdiction analysis, it need not address this alternate argument and expresses no opinion as to the merits of that argument.

Pero claims she never visited Cleveland, Ohio and had only one telephone conversation with an Ampco employee, one Margaret Kann who was based in Florida. (*Id*. ¶ 6.) To the extent Pero did any work on the GTAA bid in Ohio, if at all, she asserts it was from her residence in Columbus in her capacity as a telecommuter. (*Id.* ¶ 7.)

**D.     Analysis**

The question for this Court is whether plaintiff, with the facts construed in its favor and without considering any controverting assertions of defendant, has made a prima facie showing of personal jurisdiction sufficient to survive a motion to dismiss under Rule 12(b)(2). The Court concludes that plaintiff has failed to do so.

Ampco asserts that it was "enlisted" by Impark to assist Impark in making the GTAA bid and in performing the contract. However, Ampco never says where that enlistment occurred. If the enlistment occurred in Ohio, that might constitute the very sort of "reach[ing] out beyond one state [to] create continuing relationships and obligations with citizens of another state" that the Court in *Burger King*, 471 U.S. at 473, found sufficient to establish personal jurisdiction in the context of interstate contractual obligations. *Accord LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989); *see also Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) (when "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio"). Since Ampco is headquartered in California, it is more likely that Impark contacted Ampco in California than in some local office in Ohio; but the record simply does not say and the burden is on Ampco to show that Impark "purposefully" availed itself of this forum.

There is evidence in the record that Impark communicated with Ampco employees in Ohio, sent payments to Ohio, and, in February or March 2009, sent an employee to Ohio to discuss with Ampco their continuing disagreement as to the terms of the contract. However, this was a result of *Ampco's* choice to work from Ohio. Impark had no control over that decision, and the fact that Impark was then required to communicate with Ampco employees in Ohio is not proof that *Impark* "purposefully availed" itself of the Ohio forum. *See*, *Calphalon*, 228 F.3d at 723 ("[defendant's] phone, mail, and fax contact with [plaintiff] in Ohio and [defendant's] physical visits there occurred solely because [plaintiff] chose to be headquartered in Ohio, not because [defendant] sought to further its business and create 'continuous and substantial' consequences there.")

Again, since the burden is on plaintiff to make a prima facie showing of personal jurisdiction over Impark, that burden can only be met by a record evidence that *Impark* chose to purposefully avail itself of this forum, not that *Ampco* made choices that resulted in actions being taken by Impark in Ohio. *See Ashton Park Apartments, Ltd. v. Lebor*, 252 F. Supp. 2d. 539, 543 (N.D. Ohio 2003) (the purposeful availment requirement is met "where the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state.'" (quoting *Neogen Corp.*, 282 F.3d at 889).

Also, as noted in *Calphalon*, "the mere existence of a contract between [a party] and an Ohio citizen [...] is insufficient to confer personal jurisdiction over [that party]." 228 F.3d at 722. There must be "'the kind of substantial relationship with the forum state that invokes, *by design*, the benefits and protections of its laws.'" *Id*. (quoting *LAK*, 885 F.2d at 1300) (internal quotation marks omitted) (emphasis added). "'[P]rior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing' must be

13

considered to determine whether 'the defendant purposefully established minimum contacts within the forum.'" *Id.* (quoting *Burger King*, 471 U.S. at 479).

Here, just as in *Calphalon*, "the actual course of dealings between the parties demonstrates that [Impark's] contacts with Ohio were purely fortuitous and attenuated." *Id.* (internal quotation marks omitted). "The defendant was not attempting to 'exploit any market for its products' in the state of [Ohio], but rather had contact with the state only because the plaintiff chose to reside there." *Id.* at 722-23 (quoting *Int'l Techs. Consultants v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997)). While it is true that Impark, a Canadian corporation, reached out to Ampco, a California corporation, to forge a partnership that would benefit Impark, the uncontroverted evidence establishes that it was Ampco who chose to conduct its activity regarding the business transactions from Ohio.

The Court concludes, therefore, that Ampco has not established the first prong of the test set forth in *Mohasco Industries*. As a result, analysis of the second and third prongs is unnecessary. *See LAK*, 885 F.2d at 1303 ("The plaintiff having failed to pass the 'purposeful availment' test, we need not dwell on the other criteria of *Mohasco Industries;* each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked.")

## III. CONCLUSION

For the reasons discussed herein, concluding that plaintiff has failed to establish a prima facie showing of personal jurisdiction over defendant, defendant's motion to dismiss for lack of personal jurisdiction (Doc. No. 3) is **GRANTED** and this case is **DISMISSED**.

**IT IS SO ORDERED**.

Dated: March 27, 2012

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**